Good morning, your honors. May it please the court. My name is Kate Stetson. I represent the petitioner in this case, Mountain Valley Pipeline. Pipeline permit applications, as this court knows, require a lot of complex federal and state choreography. Many different federal and state agencies have roles to play in that process. This appeal involves whether the state agency responsible for certifying North Carolina's water quality overstepped its role. A state water quality certification, also called a 401, is a key component of the federal pipeline permitting process. But water quality is also the limit of the state's certification authority in that respect. North Carolina can't issue a water quality certification conditioned on changes to a pipeline's route. That is for FERC to decide. North Carolina can't deny a water quality certification based on its conclusion that the pipeline isn't needed. That's for FERC to decide. And similarly, North Carolina must consider that water quality certification based on the activity that is proposed. And here, that activity is to transport natural gas from point A to point B. If that proposed activity will comply with state water quality standards with certain conditions and mitigation, as is always the case, then certification shall issue. That's the mandatory language of the regulations. The North Carolina DEQ in this case was presented with a detailed report from its hearing officer that the proposed Southgate project, which is at issue here, would not violate state water standards if it was carried out under specified conditions and with the best management practices to which Mountain Valley had committed. The DEQ's decision letter, though, which is all of two pages, didn't take issue with any of those findings. Instead, the DEQ concluded, and this is at joint appendix 1363, that without certainty that a related pipeline project, the mainline project, would be completed, it would deny the Southgate project's request for a water quality certification. And in resting its decision on that basis, the DEQ went outside its lane. And it went outside its lane for three reasons. One, they ... I'm sorry, Ms. Stitt, before you get to the three reasons why it went outside its lane, I have a jurisdictional question, really. At the end of the denial letter, it says that the petitioner, MVP, can go to the North Carolina Office of Administrative Hearings within 60 days to, I guess, appeal the decision. Did MVP take advantage of that process? It did, Judge Thacker. It filed an appeal with the Office of Administrative Hearings, and then it filed a petition for review in this court. Unlike FERC, that process isn't jurisdictional. I think that's probably why North Carolina didn't raise it as such. And right now, the Office of Administrative Hearings proceeding has been held in abeyance pending this court's determination on the petition for review. The three reasons I mentioned, and I'll get into each of them in turn, have to do with the DEQ's failure to abide by its own regulations, its failure to stay within its statutory boundaries under the Clean Water Act, and then, of course, just its basic failure under the Administrative Procedure Act to explain ... This is about North Carolina's regulations, right? Yes. Then can you just explain to me a little more about, especially if it's appealed to the North Carolina Office of Administrative Hearings, and we're talking about North Carolina regulations, why this court has any business at this stage meddling in what North Carolina does before the administrative remedies have been exhausted in North Carolina? I think, Judge Thacker, the reason has to do with what I mentioned in passing is the difference between this kind of seeking reconsideration from the Office of Administrative Hearings and what would have happened if we had sought rehearing in front of FERC, if FERC had made this decision. FERC's rehearing process is jurisdictional. We can't come to you or to the D.C. Circuit until we complete that process, nor can any petitioner. This is different. This is an opportunity that is provided to a petitioner under the North Carolina processes, but it's not exclusive and it's not jurisdictional. We chose both paths, and ultimately, upon agreement with North Carolina, we agreed to hold the administrative review process in abeyance until this case went forward. In terms of what this court has to rely on, what this court has to rely on is the North Carolina DEQ's determination. That is the permit determination, just like this court reviewed the Maryland 401 certifications in the MVP case and I think the Southgate case, or I think the ACP case, I mean. Ms. Stetson, then given your reasoning, which I understand you made it very clear, this ruling, our ruling then, would not be final, would it? Then North Carolina, since you have a parallel proceeding, could rule differently, correct? No, I don't believe that's the case. I think the reason that the parties agreed to hold the hearing in abeyance, that additional process in abeyance, was precisely to wait for this court's decision before deciding whether to move forward or not. If this court concludes that the DEQ overstepped its bounds, that the basis for its determination was not an administrative procedure act, this case would return to the DEQ for further proceedings on that. So I don't think there's a finality issue here and I'd point out that the DEQ has not raised, you know, agreed with us to obey the other case and has not raised any jurisdiction or finality issues here. But doesn't that undermine federalism, the whole idea that it's allowing the states to the barriers and preparing barriers and those kind of rivers? Well, why would we be the final word on what the North Carolina law would say about those things? I think it doesn't undermine federalism, Judge Gregory, because of the cooperative federalism that's baked into this entire process. I mean, the reason that we're in front of you in the was kind of a pertinent to the federal pipeline permitting process. So there already has been that allocation of state authority and federal responsibility, including this court's responsibility to take appeals from denials of, among other things, 401 permits. So I don't think that you're, I don't think you're overstepping your role at all. I think the DEQ overstepped its role, which is the basis for our appeal. If I could turn to the regulations, and I want to make one thing clear from the beginning, there's a lot of back and forth in the opposition race and the reply about what regulations control, the current ones or the former ones. And our point is under either regulation, either under the current regulations or the former regulations, DEQ violated them both. So this court needn't conclude, we suggested that it needn't conclude which regulations apply because the same answer ends up either way. But just to start with the current regulations, the current regulations, and this is 15A of the North Carolina Administrative Code, 2H.0506, the current regulations require the DEQ to assess whether the proposed activity, that's the language, has satisfied six specific factors. And then upon determining that the division shall issue a 401 certification. The hearing officer in this case, and you can find this in detail at Joint Appendix 1349 through about 1355, the hearing officer in this case did a careful and thorough job walking through each of the various water quality issues that are with certain conditions attached that water quality standards would not be impacted by the proposed activity. Where the hearing officer went off the rails and where the DEQ based its entire determination was in finding that because the hearing officer and then the DEQ were not sufficiently certain that the mainline project would be completed, that all of those other findings, that water quality wouldn't be impacted, that surface water wouldn't be impacted, that no mitigation was necessary, that any mitigation under riparian rules was accomplished, all of those things were thrown out the window in favor of this determination that because mainline may or may not go forward, they weren't sufficiently certain about the Southgate project to be able to attest to its water quality. That is a kind of re-examination and negation of the project's purpose that is outside of the DEQ's lane under both the current regulations and the former regulations, if we want to talk about those. What the DEQ is asked to do is to look at what the activity that is proposed is planned to do. So could we find that maybe DEQ properly denied this 401 certification and had jurisdiction under the Clean Water Act? If I'm following where it looks like to me, you really may be going, I'm not sure, is that it wasn't a reasoned decision because the record reflected that there was, it didn't violate the water quality under Section 401 certification. And if your client complied with it, then it would be fine, but yet they denied it. And there seems to be some inconsistency in that determination. Does that, am I following that right? Yes, Judge Wynn. So when we, you know, this is where, again, I can get confused when we deal, when we're going to the Clean Water Act, we don't really need to, if we can say, yeah, they did all right with Section 401 certification. It's the decision that ultimately came from those determinations that's important. And it is your condition, as I understand it, that it wasn't a reasoned decision because of this inconsistency. Judge Wynn, that's right. But I want to clarify if I could that there are two types of unreasoned decisions. There's a decision that's not accompanied with the right reasoning. And that would result in a kind of, you know, the do-over that we've seen, where you send it back to the agency and the agency supplies the missing reasoning. But the first two of our arguments in our brief are the other type of unreasoned decision, which is more that the decision is outside of the DEQ's authority to make in the first place. If the DEQ based its decision... But my point is, you don't need to go there, do you? If you can get to that first one, that is, that the, what they ultimately did is inconsistent. You can't say it meets 401, it's a 401 certification, and if you comply, it's there, and then come back and deny it. I think, I think what we would argue is, yes, to your point. But to the extent the DEQ based its decision on something that it was not permitted to consider, that is, I think, more of a significant defect in the DEQ's decision. It wasn't just that its decision didn't line up with what the hearing officer said throughout his decision. It's that what the DEQ based its decision on, and you can see in North Carolina's brief, it says there is no dispute about the factual basis for the DEQ's decision. That we agree with. The DEQ based its decision on something that it was not permitted to consider. It is not permitted to consider whether the purpose of a project will be ultimately fulfilled. That is in FERC's lane. That is part of the purpose and... Now we're talking about the 401 certification? Yes. That is what we're talking about. Well, I don't read it that they're saying those are, they weren't weighing the purpose. It seems to me when I read it, and I know you disagree with this, but let's get at least the apples to apples. It's not the purpose. They're not saying that if this had been, if this project goes through North Carolina all the way to where it's supposed to go, to Graham, North Carolina, that its purpose wouldn't be fulfilled. They weren't. They're saying is that, how can we do our fiduciary duty to protect our waters and say, have the least impact? Because there will be impact here. Some temporary, sometimes short-term, whatever, it will be impact. We are trying to say that based on the stoppages and the questions about whether or not this thing is going to get done, we got to determine whether or not, should there be any disturbance or impact when it may not happen. But they're not saying that we're weighing the purpose, whether the purpose is good or bad. They're saying whether or not on this stage, is it viable to go forward in doing our fiduciary duty with such a sketchy, if you will, project that may never need to disturb any of North Carolina's waters and They weren't weighing the purpose. Would you respond to that? And you said, I disagree with the saying the purpose of the project. Sure, Chief Judge Gregory. And I know my time is running out, but I hope you'll permit me, because there are a couple of different responses to your question. The first is the DEQ certainly did take issue with the purpose. Because of course, what it was supposed to look at is what is this proposed activity? What is the purpose of the project? And by saying, we know what the purpose is, we just don't think it's actually going to happen. That negates the purpose of the project. And when you said viability, Chief Judge Gregory, I think that brings up a very important point. And I think it's one that the court can rest a lot of confidence in. Because when I talked earlier about this being FERC's job, FERC's decision about purpose and need, I'm referring specifically to a statutory obligation that FERC has. And this is 15 U.S.C. 717 F.B., as in boy. A certificate shall be issued to any qualified applicant. And then there's words that don't matter. If it is found that the applicant is able and willing properly to do the acts and to perform the service proposed. So that viability question, Chief Judge Gregory, that you just raised, that's the component of FERC's do this project. And when it comes down to the current viability of the project, the one important point I want to make, and I know I'm over my time, so please indulge me for just this point. What FERC concluded in this case was that work could not go forward on the Southgate project until two things happened. The first is that the necessary federal permits all issued. And the second is that FERC's Office of Energy Projects issued a notice that Southgate could proceed. So there is nothing that is going to happen imminently with Southgate until those two FERC conditions are satisfied. And one of the real defects in the DEQ's order here isn't just that it overstepped its lane, it's that it had that option available to it. It could have mirrored those conditions and said this will not be permitted to go forward until all federal permits are issued and FERC issues a notice to proceed. But it chose not to do that. It chose to question the very purpose of the project and to deny it on that basis. And that, we think, was a statutory and regulatory error. Thank you, Your Honors. Thank you, Ms. Stetson. Mr. Crabtree? Good morning, Your Honors. May it please the Court. My name is Taylor Crabtree and I represent the Southgate Project. This case is not about the Department substituting its policy preferences for those of the Federal Energy Regulatory Commission. This case is about whether a state can require an applicant to provide reasonable assurance that the water quality impacts of the project it proposes will not be objectively unnecessary. Southgate is atypical in that it is wholly contingent on another large linear project, the mainline, that is still under construction. And the mainline has been subject to an abnormal degree of regulatory uncertainty given the multiple verifications and authorizations that have been vacated by this Court. Southgate will have its most significant water quality impacts during the period of construction as streams are dammed and pumped and trenches are dug through stream beds and wetlands, allowing that construction to commence without reasonable assurance that the mainline project will ultimately be completed is inconsistent with the avoidance and minimization requirements of North Carolina's 401 rules and its riparian buffer rules. Mr. Crabtree, could you briefly address the jurisdictional issue that I asked Ms. Stetson about? Certainly, Your Honor. So I believe jurisdiction for this Court is found in the Natural Gas Act at 15 U.S.C. Section 17R, subsection D.1, which provides that the United States Court of Appeals for the circuit in which a facility subject to regulation under the National Gas Act is proposed to be constructed shall have original and exclusive jurisdiction over any civil action for the review of an order of a state administrative agency acting pursuant to federal law. That covers Section 401 certifications like this one. We've taken the position that this jurisdiction is original and exclusive, as the statute provides, and that the Office of Administrative Hearings in North Carolina does not have jurisdiction over this action at all. We think this action lies exclusively in this Court, but we did agree to hold that action in the Office of Administrative Hearings in abeyance to avoid having to resolve that issue. But we believe that this action is properly before this Court, and it's properly, exclusively before this Court. You heard Chief Judge Krieger's question in exchange on the purpose here. That denial letter that was issued to the petitioner contained a lot of references to the viability of this project's intended purpose, given its reliance on the mainland project. Why is that relevant to determining whether the proposed pipeline satisfies the state's water quality standards? Certainly, Your Honor. So, the state's water quality standards, in order to issue a 401 certification, requires an analysis of whether the project has avoided and minimized water quality impacts. So, whether the impacts that occur are necessary. Given the substantial uncertainty surrounding the mainline, North Carolina was concerned that any water quality impacts that were incurred by the project prior to achieving certainty regarding whether the mainline would be completed would ultimately be unnecessary. So, if Southgate were allowed to go forward and the mainline project ultimately did not come to fruition, any water quality impacts, the damming and pumping of streams, and cutting of trenches through streams would ultimately be unnecessary. So, now, just to help me out, don't you have to assume that the pipeline will achieve its purposes? And so, isn't your role here to consider how to minimize the pipeline's impact, given its construction? So, Your Honor, I think this case can be distinguished from cases where MVP accuses the department of reweighing the purpose. But I think Chief Judge Gregory made a good point. This is not reweighing the costs and benefits of the proposed pipeline. This case is not about the department saying that the benefits of the natural gas supplied by this pipeline are not sufficient to outweigh the costs to North Carolina's environment. This case is about North Carolina's water quality standards regulations, which require that the impacts to water quality, and this pipeline will have significant water quality impacts, will not be for no purpose at all. And in this regard, we're not second-guessing any determinations made by a Federal Energy Regulatory Commission. I don't think the Federal Energy Regulatory Commission could possibly disagree with us that if the mainline does not come to fruition, any water quality impacts of this pipeline will have no purpose. They will have been unnecessary. Let me ask you a question about the ultimate decision and the reason decision-making here. You had a hearing officer, and he found, and I'll quote it, the project is not expected to violate water quality standards if the certification is issued, and if the conditions in the 401 water quality certification are fully complied with by the applicant. So it seems to me, if you did comply with 401 quality certification, jurisdictionalized under the Clean Water Act, then once you get to this, it says, how does this finally lead to your justification in the denial letter approving this project? It says all of these things about the environment impacts to water quality and the so-called riparian buffers. I love that word. How does that jive is what I'm saying. It looks like it's inconsistent to me. Certainly, Your Honor. I think what's important about that statement that you just referenced is that that statement was contingent and conditioned upon a certification issued with the conditions that were recommended by the hearing officer. One of those recommended conditions was a condition that required the resolution of all legal ambiguities regarding MVP's permits for the mainline project, those being resolved prior to commencing with construction. And the hearing officer expressly recognized when he recommended that condition that a denial might be necessary to address that same concern, the concern about the uncertainty with whether the mainline would ultimately be completed. And so I don't think that that can be viewed as inconsistent with the department's ultimate decision when the department ultimately took that second recommended condition, not a recommended condition, the recommended option, the recommended option to deny the permit and then require MVP to reapply once its path forward on the mainline is clear. So I'd like to make three points today. First, the decision was consistent with North Carolina's 401 certification regulations and its riparian buffer regulations, both of which require an analysis of the ordinance amortization. Second, the decision was within North Carolina's authority under the Clean Water Act. And finally, the department adequately explained the basis for its decision. So starting with consistency with state regulations, absent a certification, the Southgate project will violate water quality standards in the North Carolina water quality standards in 2B0211. Now, North Carolina's the connection between this Southgate project and the mainline, what would need to happen for the DEQ to be assured that the mainline will be completed? Well, Your Honor, at a minimum, I think MVP would need to address the issues that led to the denial. So on the second page of the denial at 1363, the department references the multiple firm permits that had been vacated by this court. At the time the department issued its denial decision, this court had vacated MVP's authorization to proceed through the Jefferson National Forest. That authorization was reissued a couple weeks ago and was immediately challenged. This court had also vacated the verification of compliance with the Army Corps Nationwide 12 Permit issued by the Huntington District Engineer. That was reissued back in the fall, and as you know, Your Honor, this court recently suggested that that permit, that reissued authorization was likely unlawful again. So at a minimum, it would need to address those concerns, address those deficiencies in those permits prior to reapplying to the department. So North Carolina's regulations do provide a path to approving removals of use, to approving such removals of use that would otherwise violate water quality standards. North Carolina's anti-degradation policy, which is another component of its Clean Water Act standards programs, allows for removals of use to be approved, provided that the applicant can show that the project adequately avoids and minimizes water quality impacts. Analysis is required by both the pre- and the post-June 2020 versions of the 401 rules, and it's also required by the Reparation Buffer Rules. The Director reasonably determined that MEP failed to make that showing because the Southgate project is wholly contingent on the mainline for viability, and there remains significant critical uncertainty regarding the mainline project's ultimate completion. Now the department's concerns about the viability of the mainline project were not speculative. As I just mentioned, there are multiple permits and authorizations that have been already vacated by this court, and at the time the department issued this denial decision, the project was also subject to a stop work order issued by FERC based on the need to redo a flawed biological opinion. Given this cloud of uncertainty regarding whether the mainline would ever be completed, the department acted in accordance with this regulations in denying the certification because it lacked reasonable assurance that construction of the project would not result in unnecessary water quality impacts. So it seems to me you and petitioner have some disagreement as to whether that Jordan Lake Riparian Buffer Rules are part of the state's water quality standards as it relates to this 401 certification. They cite CPA documents that identifies it for the Clean Water Act, and that seems to be a big joint right there. So explain your position a little bit more on that, because I mean once you get there, if it takes you out of this 401 certification authority, you would be able to do what you did if it's under the federal law. Sure, your honor, happy to address that. So if you look at section 401, subsection D provides two kind of categories of bases that a state can rely on in issuing its 401 certification decision. The first is a set of enumerated Clean Water Act standards programs that includes the state's water quality standards, and the second is other appropriate requirements of state law. North Carolina's argument is that its Riparian Buffer Program falls within this grant of authority for other appropriate requirements of state law. That's because the Riparian Buffer Rules, although they don't fall within that enumerated set of standards, are plainly focused at preserving water quality. And as we explained in a citation to EPA's handbook on this point, pages 8 and 9 of our brief, EPA has long taken the position that Riparian Buffer Rules, like the Jordan Rules, do fall within this grant of authority for other appropriate requirements of state law. So MVP and the state, your honor, may have just been talking past each other a little bit. We have consistently contended that this falls within the grant of authority for other appropriate requirements of state law, not in that former category of state authority. So turning to the Clean Water Act, the department's decision was not about the department's policy preferences. It was about water quality, and it was about preventing unnecessary water quality impacts, and that falls within the scope of North Carolina's authority under the Clean Water Act. So as we just discussed, there's two regulatory bases for North Carolina's decision, and both are permissible bases for a denial under Section 401. Section 401 allows the state to base its certification decision on either one of several enumerated Clean Water Act standards programs. That includes the state's water quality standards or other appropriate requirements of state law. And as I explained earlier, the project will remove uses in the streams and wetlands that it crosses. So the answer under the Clean Water Act, am I oversimplifying this by saying that you're simply saying that you denied this certification based on North Carolina's quality standards or your own quality standards? Yes, sir. And having done so, you didn't act arbitrary or capricious? Yes, your honor. Is that an oversimplification? I don't know if I would say it's an oversimplification, but it's certainly a simplification. I mean anything else you add to it is nice, but that's really all you're saying, isn't it? That's correct, your honor. This is about North Carolina's water quality standards, and it's about North Carolina's requirement that any violations of the water quality standards can only be excused if the project avoids and minimizes water quality impacts. So am I assuming now you're going to go to your third point. If we agree if you own a 401 certification, agree on this is clean water, then the question relies upon whether this was a reasoned decision. Sure, your honor. It goes back to the findings as opposed to your conclusions, where I seem to see there is some inconsistency at the very least, if not just it doesn't follow it so much in terms of what was found and what was concluded. It seems to me to be the heart of what we're dealing with here. I mean we can get into the I don't know what we need to decide. Sometimes you can actually, if we got there and went in that direction, we could assume the first two things and get here, but I'm concerned about that. The findings that were made and what the conclusions, there seemed to be some inconsistency. I know you say it's conditions, so kind of explain how that condition takes out the inconsistency. Certainly, your honor. I believe the inconsistency you referred to earlier was in the hearing officer's statement that the project will not violate water quality standards if a certification is issued with the recommended conditions. If it complies with the condition, that's right. Yes, your honor. I think it's important to remember that one of the recommended conditions that the hearing officer had proposed was to require the MVP to wait to begin construction until all legal ambiguities regarding its permits had been resolved. I think here it's critical to understand that the hearing officer's proposed condition in this regard is different than the condition that was ultimately adopted by FERC. MVP in its brief repeatedly equates the hearing officer's proposed condition with that proposed by FERC, but this is a significant difference. FERC would have allowed MVP to begin construction, as Ms. Stateson recounted earlier, upon issuance of the permit and a notification from FERC. What the hearing officer would have required is that the legal ambiguities, any potential challenges regarding those permits, to be resolved prior to the allowing construction to begin. That's critical given the number of verifications and authorizations that have been issued by various federal agencies only to be subsequently vacated by this court. That's happened two and soon to be likely three times from this court. I think that difference is critical. To get back to your question, Your Honor, the reason that's consistent with the ultimate denial decision is that the hearing officer recognized that that concern about avoiding and minimizing unnecessary water quality impacts, the concern that stems from the uncertainty regarding the mainline project, could be addressed in one of two ways. It could either be addressed through this conditional certification or it could be addressed through a denial, which is the option the department ultimately chose. The hearing officer didn't recommend one or the other. It didn't list either as a preferred option. It simply listed both of them as options. In that regard, I don't think you can say that the ultimate decision was inconsistent with the hearing officer's proposal, given that it ultimately adopted one of the two options recommended by the hearing officer. To the extent that the court thinks that the agency could have better explained its decision to reject the hearing officer's proposed condition, the reason for that rejection is obvious. A condition that required that legal ambiguities be resolved is not an actionable, enforceable condition. The option available to the department is not a certain condition. Is it still the condition that I think you responded to me earlier when I said what needs to happen. I think you still responded that sounded like legal ambiguities need to be resolved or all these issues with the permits need to be resolved first. Is that right? Yes, Your Honor. That's correct. Let me see if I can address that. That put the opponents of the pipeline in a position to, well, anytime a permit is issued, we will immediately file something against it so that there continues to be legal ambiguity. That seems like a problem. Certainly, Your Honor. I did mean to suggest that, so let me take a step back. The department's denial decision was based on the continuing uncertainty. My only point regarding the condition not being an actionable condition was that when a condition is inserted into a certification decision, that becomes a part of the federal permit. Folks need to know on the ground what that condition means in order for it to be enforceable. That was my only point regarding that condition not being an enforceable condition, given the vagueness of that condition. I see that my time has expired. One last question on that. The hearing officer required that the pipeline wait until you got these legal ambiguities surrounded to be resolved. Why wouldn't that lead you to consider the other option that was offered by the officer, that is, that the certification be conditioned? I'm sorry, Your Honor. In other words, could the certification be conditioned upon that factor? Yes, Your Honor. I think the point I was trying to make is that that condition, if it had been imposed, would not be an enforceable one. That it would be too vague to be an enforceable condition, and so a denial was the option that the department chose. I see. Thank you. Go ahead. What did you say? Nothing further, Your Honor. Thank you. Thank you, Mr. Crabtree. Ms. Jensen, you have some time reserved, but before you start, I want to, because I take blame for this, because I use the term viability, and I could tell from your response that I didn't do a good job of clarifying and perhaps using the wrong word. Let me put it simply this way, and I want you to respond to it. I know you don't have a lot of time. It's this. I think it's better to say it was this, that the 401 certification was denied by North Carolina under this obligation, as it understood under the Clean Water Act, to minimize the impact, and in that obligation, the reason why they denied it is because at that point, they were not certain when they issued it that that would not result in unnecessary water quality impact. That's the sole reason. The unnecessary has nothing to do with purpose, policy, or, as I wrongly said, viability. It is all a simple common sense question. That is this. We don't want you to start constructing this thing because most of the impact is doing construction until we know it would be even necessary to do so. There's so many, not just suits, but court rulings and judgments of problems, of stop orders, that we don't want you to do something in North Carolina that may be unnecessary. It is not policy. So, would you respond to that? Why can't they say that simply? Now, there's another question, which option they took, but I'm talking about why is that out of their wheelhouse, not to do that under their obligation under Clean Water Act and say, we don't want you fiddling around in North Carolina when something might turn out to be unnecessary. You disturbed our waters for nothing based on where your project is with the main line. That's what they're saying. Now, would you respond to that? Certainly, Chief Judge Gregory, and I think it also dovetails with the question that Judge Wynn asked Mr. Crabtree. And I think what's missing from both the NCDEQ's brief and from Mr. Crabtree's presentation is that the brief and Mr. Crabtree's argument reduced the issue down to avoidance and minimization. You see that phrase over and over again in the North Carolina brief from page three to page 67, avoidance and minimization. The issue is, and this is why the purpose matters, if you go back to the regulations, and now, to be clear, we're talking about the 2019 regulations, but let's sit with them for a minute. What it says is, lack of practical alternatives, which is what this whole discussion is turning on, may be shown by demonstrating that, words not necessary, the basic project purpose cannot be practically accomplished in a manner which would avoid or result in less adverse impact to surface waters or wetlands. So, the reason I said this gets back to Judge Wynn's question is because whether you look at the new regulations or the old one, you have to assume something important. You have to assume, as Judge Wynn said, that the project will achieve its purpose. Not that the purpose won't be achieved because of some third condition, but that the project will achieve its purpose. That's what the avoidance and minimization language is tied to. And I think it's quite telling, frankly, that the North Carolina brief drops that qualifier. It's not just, will this project avoid and minimize impacts? No project would be built if that were the standard. It's, can the purpose of this project be fulfilled in a way that avoids or better minimizes impacts? And what the hearing officer in this case concluded was that the answer to that question was no. There's no other way to fulfill the purpose of this project, is what he said, and minimize impacts any further. The water quality impacts will be minimal. The water quality impacts will not be, surface water and other impacts, will not be suffering under this particular project. So, that's the first point. The second point I would say is, just to be very clear on, Chief Judge Gregory, you made the point that you weren't initially asking about the remedy that was imposed. You were asking about the reasoning, and I hope I've answered that. But with respect to the remedy, I want to make clear what the condition was that we're talking about, because there is a passing reference during the hearing officer's decision to this idea about legal ambiguities surrounding the project. And I think for both the reasons that Mr. Crabtree pointed out and Judge Thacker pointed out, that's not a serviceable standard. A permit, when it is issued from a federal agency or anyone else, has a presumption of regularity. So, simply assuming that a permit under challenge is going to meet a particular fate is not the standard. The condition that was actually imposed or suggested by the hearing officer is on Joint Appendix 1360. And it's exactly the same condition that FERC imposed, a condition requiring the lifting of all the stopped work orders and acquisition of all necessary permits for the Mountain Valley Pipeline Maintenance Line Project be acquired before the 401 certification is valid. So, that's the condition that we're talking about. And one of the things that you didn't hear Mr. Crabtree explain is why that condition wouldn't suffice. And that is one of the points of our brief. If the DEQ is called upon, as it was here, to exercise its discretion in a particular way, it needs to explain why it exercised its discretion to deny a water quality permit when all of the findings leading up to that point suggested that the permit should be granted. And I want to be clear on this too. It's not that the ultimate conclusion of the DEQ was somehow inconsistent with the hearing officer's finding. The hearing officer lobbed in the same suggestion that the permit just be, that the application just be denied. Every single finding pertinent to the water quality question pointed in favor of Mountain Valley Pipeline. That is the inconsistency we're talking about. The last point I'd make is this. In order for this court to uphold what the DEQ did in this case, it has to conclude three different things. It has to conclude that the DEQ did not violate its own regulations when it examined whether a purpose could be carried out. It has to conclude that it did not overstep its statutory authority despite the fact that FERC is the one who decides purpose, need, and viability. And it has to conclude that despite all of the hearing officer's factual findings that this project would not impact water quality, that the DEQ's conclusion nevertheless can be upheld. We think for any and all of those reasons, the conclusion should be reversed. Let me make this clear. I understand your argument, so I'm not going to quibble with that because I respect that that's your view. Let's make sure this, no one ever found that this project wouldn't have an impact. I believe, you correct me please because you know the record far better than I do, but what they found is that they had their proposal for the construction done as much as they could to minimize the impact, both temporary and short-term. Am I wrong about that? You are not wrong about that. What I would say is, and I think- No, no, no, no, no, you don't have a lot of time for that. No, I agree though. The point is that no one ever said it won't be in it. It's just that they've done all they can to minimize. I don't hear North Carolina quibbling with that finding at all. I agree with you. If they were saying, oh no, they're wrong. They could have done this and that and that. We're going to go and we're going to pick that and find. No, what they're saying is, now it's up to us to determine this, but that is this, just common sense. We can't be assured here with some certainty under our obligation to protect our state and clean water that it won't be an unnecessary adventure. The adventure is fine, the policy, the purpose and all those things and minimizing, but it would be absolutely unnecessary even to have the minimized, properly minimized impact if you start this Southgate project and you have nothing to hook it up to in the main line. It's not just people rattling their saber or causing it. These are judgments from the United States Court of Appeals for the Fourth Circuit that have come out and that we're part of. FERC has a role, the state has a role, and the independent judiciary has a role too. It has done so. You have to convince us that it's unreasonable for North Carolina to look at the state of the judicial rulings and determine whether or not it would be an unnecessary impact to go forward at this point. I don't take credit with the trilogy you laid out, but I think that's where this case is. They're not just looking at news reports, they're looking at judgments from this court, which unless the Supreme Court says otherwise, is the law. Absolutely. Chief Judge Gregory, let me make two quick points. The first is when you talk about a project being unnecessary, I think the next question that you have to ask yourself is unnecessary because of what? Unnecessary because the DEQ concluded in this case, the main line project might be completed. It's 80% completed. Maybe it won't get the rest of the 20%. That is the problem though with what the DEQ did here. In finding that it was potentially unnecessary, the DEQ went outside its lane because what the department is supposed to do in the water quality certification is to say, if the project's purpose is fulfilled, like Judge Wynn said, we assume the project's purpose is achieved. If it's achieved, has it avoided and minimized water quality impacts to the extent possible. An agency can always find a project might not be necessary, but that's not this agency's charge under its particular allocation of roles. And I would end with this point. Chief Judge Gregory, you made the point about the prior decisions. Some of them upheld agency actions. Some of them have found fault with them. When these decisions have found fault with agency actions, it's been because either the agency went outside its assigned role or didn't explain itself or didn't adequately do its job. And I think in this case, all of those things are true and the same situation should hold here, if there are no further questions. I just want one question. Can I ask you a hypothetical? Certainly. It's a far-fetched hypothetical, of course. That's why it's hypothetical. But if you have a situation where someone is going to build something, a widget line or whatever it is going to be, and we find out, as a matter of fact, that they are undergoing bankruptcy and all the kinds of things like that, it's just clear that there's a problem with not viability, it's just the matter of fact, they've almost at this point put it on hold and nobody knows what they're doing in the other state, for example. Your position is that as long as FERC has okayed what they're going to do in your state, state X, no matter what's going on and what the real practical, what's going on in state Y, they can never consider that in terms of whether or not it might be an unnecessary impact. Is that your position? I think, granting that it's a far-fetched hypothetical, I would say it's our position that there is another agency with responsibility over what you're talking about. If you take your example and you talk about bankruptcy, let's put it into the pipeline context. FERC would have the authority and the responsibility to make determinations, including the one that I mentioned earlier. Is this pipeline sponsor, this applicant, ready, willing and able, able and willing properly to do the acts and to perform the requested, that would be FERC's prerogative at that point to say this project is no longer viable. That's why I think the conditions that were attached here by FERC are so important. Again, Mr. Crabtree didn't refute these. The conditions are all federal permits issue again and the Office of Energy Projects and FERC issuing notice to proceed to Southgate. Nothing is going to happen until those two things happen. As Mr. Crabtree pointed out, those things are in the process of occurring, but the permits haven't all issued yet and the notice to proceed has not issued yet and will not until that point. Now, at the point where those permits issue, then I think you should attach the presumption of regularity I mentioned earlier. It cannot be, as Judge Thacker said, that we wait to see whether anyone challenges a permit to decide whether or not a project is viable. If a federal permit issues, that carries something. It carries a presumption of regularity. So at the point where all permits issue and the notice to proceed goes forward, that is the point where Southgate would start, not before then. And I want to make that very clear. No, I understand. I just branded you that it was Congress that put this federalism track here, right? It gave the states the authority. It could have said FERC is final, but it didn't. So everything you said in the hypothetical, somebody else like FERC could jump in, but there's nothing that says that the state can't protect itself and that is not give up its 401 certification. Yes. Dealing with my outlandish hypo, which I gave, but I agree with it. Everything you say is true, but because it was Congress that did this, Congress could have said, FERC, you know everything. You're smart. I don't care what North Carolina says. They can do it. No, it didn't. It said North Carolina can protect it. And until Congress changes that, we'll have to grapple with this. And this is a situation, but it is not one to just say that FERC knows everything. It's because the state can. And the state under my hypo, the state where you would say, no, you have to certify right now and hope that somebody in Washington will save you. But no, the state of North Carolina perhaps can save itself. Physician, heal thyself. That is what they're saying is we have a state and whether or not that. And I'm not saying we're not. That's what we have to decide. But I just want to get it down to what North Carolina is saying and what they're not saying. Yes. That's what the argument is in this case. But I think we've said it long enough. Chief Judge Gregory, may I make one more comment? If you want 30 seconds, I'll give you 30 seconds. I think the question is, and this is a lawyerly answer. What does final mean? When it comes to determining water quality impacts, North Carolina's decision is final. When it comes to discerning the purpose, the route, the need, the viability, other conditions of the project, FERC's is final. So what the DEQ can't do here is to say, yes, our hearing officer determined and made all mitigation and other conditions are met, that the project will not have other than minimal water quality impacts necessary to serve the purpose of the project. That is the end of the road. That is the water quality determination and DEQ can't step into FERC's determinations to conclude otherwise. Thank you for your indulgence. Thank you, counsel, Mr. Crabtree. That's very, very well done. I appreciate your arguments. We wish we could come down and shake your hands. We cannot under the circumstance, but please know that our appreciation is nonetheless, and we thank you so much and pray that you will be safe and stay well. Thank you, counsel. Thank you very much.
judges: Roger L. Gregory, James A. Wynn Jr., Stephanie D. Thacker